**OUTTEN & GOLDEN LLP**
Tammy T. Marzigliano
Allison L. Van Kampen
Shira Z. Gelfand
685 Third Ave, 25th Floor
New York, New York 10017
Telephone: 212-245-1000

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
NEW YORK

| | |
|---|---|
| DAIL MOSES-TAYLOR, <br><br> Plaintiff, <br><br> -against- <br><br> GREYSTON FOUNDATION INC. <br><br> Defendant. | **COMPLAINT AND JURY DEMAND** <br><br> Docket No.: |

Plaintiff, Dail Moses-Taylor, by and through her undersigned counsel hereby files this lawsuit against Defendant, Greyston Foundation Inc., and as grounds therefore alleges:

## NATURE OF CLAIMS

1.      Plaintiff Dail Moses-Taylor brings this retaliation action against Defendant Greyston Foundation Inc. ("Greyston" or the "Foundation") to remedy violations of New York's Not-For-Profit Corporation Law (the "N-PCL") § 715-b, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 296, *et. seq.* (the "NYSHRL").

2.      Ms. Moses-Taylor, a 51-year-old Black woman, dedicated more than 16 years of her career to Greyston, a 501(c)(3) non-profit organization based in Southwest Yonkers. Despite her stellar performance, Ms. Moses-Taylor was denied a promotion to Vice President of Strategic Programs, a role she was qualified for and deserving of, in retaliation for her efforts to

ensure a safe working environment for Greyston employees.  Indeed, after Ms. Moses-Taylor raised these workplace concerns, Greyston admonished her to never do so again and denied her the VP promotion, citing her protected complaints as the reason for its decision.

3.      This was not the first promotion Ms. Moses-Taylor was unlawfully denied during her lengthy tenure.  Prior to January 2021, there was not a single Black woman in senior management and Ms. Moses-Taylor was repeatedly passed over for promotions in favor of less-qualified non-Black men.  Deflated by this reality, Ms. Moses-Taylor shared her concerns about discrimination with Greyston's Human Resources Director and retained counsel.  Shortly thereafter, Greyston hired a Black woman for the VP of Strategic Programs role Ms. Moses-Taylor was wrongly denied, and thereafter began an immediate and ruthless retaliatory campaign against Ms. Moses-Taylor which culminated in Greyston placing her on an unpaid leave of absence and then unjustly terminating her employment for pretextual reasons.

4.      Ms. Moses-Taylor brings this action to recover actual damages, compensatory damages, punitive damages, front pay and/or reinstatement, back pay, interest, attorneys' fees, and costs and other appropriate legal and equitable relief.

**THE PARTIES**

5.      Plaintiff Dail Moses-Taylor is an adult individual who is a resident of New York.

6.      Throughout the relevant period, Ms. Moses-Taylor was an "employee" within the meaning of Title VII and the NYSHRL.

7.      Defendant Greyston is a 501(c)(3) not-for-profit corporation organized under the laws of New York, with its principal place of business located at 21 Park Avenue, Yonkers, New York 10703.

8.      During the relevant time period, Greyston employed more than 20 employees and

earned an annual revenue in excess of $1,000,000, and is thus subject to N-PCL § 715-b.

9.      Throughout the relevant period, Greyston was an "employer" within the meaning of Title VII and the NYSHRL.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Ms. Moses-Taylor's Title VII claim pursuant to 28 U.S.C. § 1331.

11.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Moses-Taylor's NYSHRL and N-PCL claims because they closely relate to her Title VII claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

12.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is established under the laws of New York State and operates its business in New York State, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

13.     On April 20, 2021, Ms. Moses-Taylor filed a charge of race and gender discrimination and retaliation against Greyston with the United States Equal Opportunity Employment Commission (the "EEOC") under Title VII.  On or about May 3, 2021, the EEOC issued Ms. Moses-Taylor a notice informing her of her right to sue.  Ms. Moses-Taylor has thus complied fully with all prerequisites required by Title VII.

## FACTUAL ALLEGATIONS

### Greyston's Background and "Mission"

14.     Founded in the early 1980s, Defendant is a non-profit "social justice enterprise" serving the community of Southwest Yonkers by creating job opportunities and providing

services to disenfranchised people to enable self-sufficiency."[1]  The Foundation provided these services through its no-cost programs and services, including, Open Hiring, Workforce Development, Community Gardens, and Issan House, which prior to its closing in Summer 2021, provided accommodations, counseling and meals for formerly homeless individuals living with HIV/AIDS, many of whom also suffered from mental health and substance abuse issues.

15.    Greyston describes itself as "a hybrid social-enterprise" comprised of the non-profit Foundation and a for-profit commercial bakery it operates, Greyston Bakery, which makes the brownies and other treats in Ben & Jerry's ice cream.

16.    At the center of Greyston's collective mission is its Open Hiring® model, which offers job opportunities at the Foundation and Bakery, without requiring resumes, background checks or job interviews.

17.    In 2018, Greyston launched the Center for Open Hiring, whereby it "sells" its trademarked Open Hiring model to employers.

**Ms. Moses-Taylor's Background and Employment at Greyston**

18.    Ms. Moses-Taylor is a 51-year-old Black woman from Trinidad.  She has nearly three decades of experience in the non-profit sector, with a focus on "hard to serve" populations, including ex-offenders and the mentally ill.  Prior to joining Greyston in 2005, Ms. Moses-Taylor was the Director of Workforce Development and Placement Services for a large New York non-profit that provided transitional and permanent employment to over 2,000 ex-offenders each year.

19.    In October 2005, Greyston hired Ms. Moses-Taylor as its Director of Pathmaking Services.  Ms. Moses-Taylor then served as Human Resources ("HR") Director from 2009

---

[1]    About Greyston, available at https://www.greyston.org/about-us (last accessed July 29, 2021).

through 2013, after which she assumed the role of Director of Workforce, Education, Training and Development, where she remained until her unlawful firing in July 2021.

20.     Throughout her 16-year tenure with Greyston, Ms. Moses-Taylor proved herself a dedicated and talented leader, as evidenced by positive performance reviews and feedback from leadership, increased responsibilities, and being entrusted as an ambassador for the Foundation in community outreach and at countless conferences and meetings with agencies, politicians and funders.

21.     As Greyston's Director of Workforce, Education, Training and Development, Ms. Moses-Taylor assisted in crafting and overseeing the implementation of the Foundation's Workforce Development training programs ("WD Program"), which equip low-income individuals with occupational skills and certifications to overcome barriers to employment.

22.     In that position, Ms. Moses-Taylor was a dedicated and supportive manager to a team of four people, each of whom played a critical role within the WD Program.  Her team included: Project Retention Specialist, Barbara Saunders; Youth Program Manager, Angelca Saint-Hilaire; Manager, Greyston Rangers & Apprenticeship Programs, Albert Dalipi; and Job Developer, Kevin Townes.  Up until April 2021, Ms. Moses-Taylor also oversaw contractors who assisted with training in the WD classroom.

23.      In 2018, Ms. Moses-Taylor's team presented her with a Leadership Award during a WD graduation ceremony attended by executive leadership and over 150 guests, including City of Yonkers Mayor Mike Spano and other state and local politicians.

24.     In her more than eight years as Director of the WD Program, Ms. Moses-Taylor had a tremendous track record.  The WD Program's occupational and skills training and services resulted in credentialing over 1,200 low-income individuals.  Her program had a 70% job

placement rate and 60% 30-day on-the-job retention rate.  Also, only 4.2% of ex-offenders who participated in the WD Program were re-incarcerated, as compared to the 44% national recidivism rate.

25.     With her support, since its inception in 2009, the WD Program raised over $3 million in grants/donations and had a $30 million "economic impact" in the local community by creating jobs and public savings via reduced government costs.

**Greyston Denied Ms. Moses-Taylor a Promotion in Retaliation for Reporting Improper Conduct**

26.     On or about November 18, 2020, Ms. Moses-Taylor applied for a promotion to Vice President of Strategic Programs (the "November Promotion").  She was not only qualified for the position, she had been effectively performing that role for years because her former supervisor and current President and CEO, Joseph Kenner, had Ms. Moses-Taylor handle many of his responsibilities when he held that VP position.

27.     After weeks of having her follow-up emails regarding her application ignored, on December 7, 2020, Mr. Kenner and VP of Finance and Operations Julie Telford, informed Ms. Moses-Taylor that she would not receive the VP promotion because of three emails she sent between October and November 2020.  Mr. Kenner handed Ms. Moses-Taylor a folder containing the emails, stating that they did not reflect the Foundation's expectation of its leaders and criticized her "tone" in the emails.

28.     Mrs. Telford added that Ms. Moses-Taylor was "getting in [her] own way" with behavior like "this" as she waved the emails in front of Ms. Moses-Taylor.

29.     Two of the emails, dated October 12 and November 20, were Ms. Moses-Taylor's reports to management of Greyston's improper conduct which put at risk the health and safety of its staff and clients, in violation of the Foundation's policies, including, *inter alia*, its stated

commitment to "provide a safe, violence-free work environment," to "prevent workplace violence," maintain "safe" and "healthy" working conditions, and protect the "safety and security" of its employees.[2]  The third, dated October 15, 2020, advocated for fairer compensation for non-managerial employees.

### A.  *October 12, 2020 Email: The Knife Incident*

30.     The first email, sent on October 12, 2020, concerned an incident that occurred on or about October 2 in a WD Program classroom.  Because Greyston did not have a designated employee at the front desk (or any security at its entrance), an individual was able to freely enter the building and then a classroom, where he pulled out a knife and began threatening students and the training instructor.  Someone called 911, after which police in riot gear stormed the building.  The violent encounter and subsequent police response was extremely traumatizing for both staff and students.

31.     After this incident, Ms. Moses-Taylor and then HR Director Mary Ann Gargiulo met with WD staff, who expressed fear for their own safety and the safety of the individuals Greyston served in the unsecure building.  The staff implored Ms. Moses-Taylor and HR to immediately work with leadership to hire a security guard or at least a receptionist at the front desk.

32.     Greyston's policy states that it "is committed to preventing workplace violence and to maintaining a safe work environment," and requires employees to report to a manager, supervisor or HR, "[a]ny threats" by employees, "customers, vendors, solicitors, or other members of the public."  Handbook § 1-8.  Employees are also required to report "[a]ll suspicious individuals or activities, commotions or disturbances."  *Id.*  Unauthorized visitors are

---

[2]   *See, e.g.*, Greyston Employee Handbook ("Handbook") at §§ 1-5, 1-7, 1-8, 2, 2-2.

prohibited in order "[t]o provide for the safety and security of employees and the facilities at

Greyston." *Id.* § 3-16.  Greyston promises employees that "[a]ll reports can be made without fear

of reprisal or retaliation," and encourages employees to raise with management "ideas, concerns,

or suggestions for improved safety in the workplace."  *Id.* § 1-7.

33.     Per Greyston policy, on October 6, 2020, Ms. Moses-Taylor, together with HR,

wrote to President and CEO Mr. Kenner explaining what had transpired and communicating the

urgent need for a security guard at the Foundation's front entrance.

34.     In her response to Ms. Moses-Taylor and the WD team later that day, VP of

Finance and Operations Mrs. Telford assured them that safety was Greyston's "#1 priority" and

acknowledged that the incident on October 2, 2020 "put  [the WD] team in an unsafe

environment."

35.     The email used to deny Ms. Moses-Taylor the VP promotion, sent on October 12,

stated, in pertinent part (emphasis added):

> *I cannot stress more how much this is an issue for the executive team to figure*
> *out and provide for the safety, health and wellbeing of their staff*….
>
> It is not something that me, a Program Director without the decision-making
> authority of a VP needs to figure out and propose for review. Nor is it a grant-
> making opportunity or HR responsibility to find/identify sources of money.
>
> *Employees' safety should be taken seriously and not delayed* for a second week
> with the lack of urgency and the lackadaisical approach the staff is speaking about
> and responding with in emails to you. Last Friday evening one person emailed
> everyone offering to give up a portion of his salary to cover the expense of feeling
> safe when he comes to work.
>
> The executive team needs to address this now.

36.     Approximately three months after WD staff and clients were threatened at

knifepoint, Greyston finally hired a security guard.

**B.  *November 20, 2020 Email: COVID Return to Work Issues***

37.      The next email that Defendant relied on to deny Ms. Moses-Taylor a deserved

promotion, sent on November 20, concerned COVID-related health and safety risks at Greyston.

38.      Months prior, in early June 2020, Greyston demanded that all employees return to

work, and before that, in mid-May, even offered financial incentives to encourage staff to return

to work ***during the State and City mandated bans***.[3]

39.      Ms. Moses-Taylor's November 20 email was responding to a "COVID update"

Greyston HR had circulated to the Foundation and Bakery staff earlier that day.  In that email,

Greyston highlighted that Yonkers had been downgraded to a Yellow Zone, and reiterated its

expectation that all Foundation employees needed to report to work, even if Yonkers was

recategorized as a Red Zone.

40.      Prior to Ms. Moses-Taylor's November 20 email, multiple employees had

confided in her that they did not feel safe returning to work due to concerns about a potential

spread of the virus because they themselves or family members were high risk, and because so

many staff and clients used mass transit to get to and from Greyston, walk-ins were common,

and many clients "lived" in hotspots/Red Zones.

41.      Greyston promises employees safe and healthy working conditions.  Handbook §

1-8.  Greyston established for its employees mandatory Rules of Conduct designed "to protect

[its] employees and [the] organization," which prohibit "negligent or inappropriate conduct" that

"may result in or cause injury to persons."  Greyston also encourages employees to raise "any

issues or questions relating to the application or interpretation" of its Handbook, policies, or

---

[3] *See, e.g.*, New York State on PAUSE Executive Order, available at https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order (last accessed July 29, 2021).

"other directives." *Id.* § 2-1.

42.    Given the concerns her staff had expressed and per Greyston policy, Ms. Moses-Taylor wrote to Mr. Kenner, HR and members of the executive team, requesting additional information on the Foundation's COVID plan.  In her November 20 email, she wrote (emphasis added):

> I'd like to get clarity on one factor for my staff… Has executive leadership and HR given thought to: How are we planning to support our employees who live in orange and red zones coming into work alongside all other staff, regardless of the zone color of Greyston?
>
> We have foundation employees who live in the city and who take public mass transit with thousands of people possibly living in hot spots and some who boldly refuse to wear masks. *How can/will we safeguard those employees who are exposed to that twice each day and protect ourselves and the rest of our employees from whatever they may unknowingly bring into the workplace*?

43.    Ms. Moses-Taylor never received a response.

**C.  *October 30, 2020 Email: Ms. Moses-Taylor Advocated for Fair Compensation for Her Report***

44.    The final email Greyston used to deny Ms. Moses-Taylor the promotion, sent on October 30, sought leadership's approval for a compensation package for her then-report, Albert Dalipi, because he would be taking on a new and substantially more demanding role.

45.    In that email, Ms. Moses-Taylor expressed concerns about unfair compensation at the Foundation, as Greyston granted substantial compensation increases following promotions and increased responsibilities for leadership personnel, but not for its staff who make Greyston's mission a reality.  Ms. Moses-Taylor implored, "Let's do the right thing by people and compensate them for the work expected."

46.    While included in the folder of Ms. Moses-Taylor's "unacceptable" communications, management did not explain its purported concerns about that email during the December 7, 2020 promotion denial meeting.

47.     During the December 7, 2020 promotion denial meeting, Mr. Kenner explained that, while Ms. Moses-Taylor was a solid performer and leader, a "great ambassador" for the Foundation, and a "pinch-hitter" for him when needed, Greyston's decision was not about her abilities, but rather her creating "problems" with "very negative" emails – *i.e.*, the emails wherein Ms. Moses-Taylor advocated for Greyston to follow its own policies.

48.     Mr. Kenner ended the meeting by threatening disciplinary action against Ms. Moses-Taylor if he "ever [saw] another email like this," as he waived the folder in her face.

49.     Mr. Kenner expressly instructed Ms. Moses-Taylor to stop putting her concerns in writing and told her to instead arrange meetings with staff and executive leadership during which employees could voice any issues.  When Ms. Moses-Taylor scheduled such a meeting on December 9th, Mr. Kenner canceled it.

**Greyston Retaliated Against Ms. Moses-Taylor for Complaining about Discrimination and Retaliation**

50.     For over a decade, Ms. Moses-Taylor was repeatedly passed over for promotion to Vice President in favor of less qualified non-Black men.  Indeed, Greyston never employed a Black woman at the VP level during her first 15 years with the Foundation.

51.     After her former supervisor Mr. Kenner was promoted to President and CEO in mid-June 2020, Ms. Moses-Taylor applied for his open VP of Strategic Programs role (the "June Promotion").

52.     Greyston denied Ms. Moses-Taylor this rightful promotion, in favor of an Asian man and external hire.  When she asked Mr. Kenner for a reason, he wrongly claimed that she was not qualified and, when Ms. Moses-Taylor pushed, told her that she would not be promoted because her "tone" was "off putting."

53.     Approximately five months later, in early November 2020, Greyston announced

that the male candidate would not be joining the organization and reposted the VP role.

54.     Later that month, Ms. Moses-Taylor told HR she had no reason to think she would be given a fair chance if she reapplied, given that Greyson had already denied her that promotion in favor of a less qualified non-Black man (the June Promotion), as well as other promotions in the past.  Ms. Moses-Taylor nonetheless applied for, and was again denied, the VP promotion in November 2020.  (*See* ¶¶ X, above).

55.     Less than two months later, Greyston announced the hiring of a Black woman, Dr. Penny Jennings, for the VP of Strategic Programs role Ms. Moses-Taylor was twice unlawfully denied.  Unlike Ms. Moses-Taylor, Dr. Jennings's recent work experience was in academia and she lacked relevant non-profit experience working with ex-offenders or impoverished and disenfranchised communities, like those Greyston served.

56.     Dr. Jennings became Ms. Moses-Taylor's supervisor on January 11, 2021.

57.     Less than two weeks later, on January 22, 2021, Ms. Moses-Taylor, through her counsel, complained that Greyston discriminated against her based on her race and gender by denying her the June Promotion, and retaliated against her by denying her the November Promotion for blowing the whistle on misconduct that violated the Foundation's policies.

58.     In retaliation for raising those protected complaints, Greyston immediately began setting the stage for Ms. Moses-Taylor's firing, first by stripping Ms. Moses-Taylor of the authority to manage her staff and effectively run the WD Program she had successfully managed for eight years, and later manufacturing issues with her performance.  Within several months of her January 22, 2021 complaint, Greyston terminated Ms. Moses-Taylor's employment.

***Exclusion and Marginalization***

59.     Less than a week after her January 22 complaint, Dr. Jennings cut off Ms. Moses-

Taylor's access to the Board and Greyston's executive team, insisting that Ms. Moses-Taylor communicate exclusively through her. However, Dr. Jennings avoided Ms. Moses-Taylor and otherwise ignored her at work, including her requests for calls and meetings.

60.     In an effort to undermine her, and unlike the top-down hierarchy Dr. Jennings imposed on Ms. Moses-Taylor, Dr. Jennings consistently went directly to Ms. Moses-Taylor's team with any questions or requests about the WD Program, without even informing Ms. Moses-Taylor.

61.     Also within a week of her January 22 protected complaint, Greyston removed Ms. Moses-Taylor as presenter for a WD Program donor event that she had spent months planning, deleted her name from the agenda, and forbade her from speaking or appearing on video during the event.

62.     Before she complained, as Director of the WD Program, Ms. Moses-Taylor hosted program events with donors and/or potential donors and was prominently featured in event materials and on recordings.

***Greyston's Retaliatory Attacks Against Ms. Moses-Taylor and her WD Program***

63.     Within weeks of her protected complaints, Dr. Jennings began dismantling Ms. Moses-Taylor's WD Program with budget cuts and firings, which she falsely claimed were necessary because the WD Program had operated at a deficit for two years.

64.     Any "deficit" was a fiction Greyston created through questionable financial reporting. There was no deficit in 2019, which Mr. Kenner acknowledged and praised Ms. Moses-Taylor for in her performance review that year. Management created a nearly $300,000 deficit in 2020 by knowingly including in the WD Program budget a grant that fell through solely to appease Greyston's Board, and then using another six-figure grant intended for Ms.

Moses-Taylor's WD Program to fund a different program.

65.     Despite Ms. Moses-Taylor's explanation that there was no deficit, Dr. Jennings continued to rely on this fiction to gut the WD Program, even taking actions designed to discourage support for and enrollment in the Program.

66.     In February 2021, Greyston forced Ms. Moses-Taylor to deprive 72 individuals deserving of the opportunity to enroll in the next WD Program training cycle.  Per Dr. Jennings's directive, Ms. Moses-Taylor was only permitted to accept 20 applicants for the year.

67.     That same month, VP of Finance and Operations Mrs. Telford cited the "deficit" to deny Ms. Moses-Taylor funds to pay the small stipend Greyston had promised to pay the WD Rangers (ex-offenders who maintain public spaces in Yonkers) during their 30-day apprenticeship so that they could support themselves before job placement.

68.     Also in February 2021, Dr. Jennings demanded that Ms. Moses-Taylor fire two WD contract instructors and said her staff would need to pick up the slack.  Ms. Moses-Taylor explained that only one of her reports, Ms. Saint-Hilaire, was qualified as an instructor, but she did not have the bandwidth to take on the additional responsibility because of her existing and time-consuming obligations to the Yonkers Workforce Investment Board's Youth Initiative, which funded Ms. Saint-Hilaire's full salary.

69.     To ensure the effective functioning of her program, Ms. Moses-Taylor implored Dr. Jennings to let her retain at least one of the instructors.  Dr. Jennings reiterated that both instructors needed be fired to offset the alleged WD Program "deficit."

70.     In late February 2021, Mrs. Telford falsely accused Ms. Moses-Taylor of violating a "grant of authority" policy[4] – of which she was not aware and for which Greyston

---

[4] The alleged policy required VP approval on payments over $1,000.

was just then opting to enforce – by approving two invoices for WD trainers (totaling $3,900), which were paid many months prior and already reimbursed to Greyston by a third party.

71.     Even after Ms. Moses-Taylor explained that the invoices were paid months prior, Mrs. Telford emailed her new contracts, with the original contract dates of January 17, 2020 and July 12, 2020, and told Ms. Moses-Taylor to "fix" them by having the instructors sign the backdated contracts.  When Ms. Moses-Taylor questioned the legality of this, Mrs. Telford immediately dropped the issue.

**Greyston's Retaliation Escalated with False Complaints Against Ms. Moses-Taylor**

72.     Greyston's increasing hostility against Ms. Moses-Taylor in the months following her protected complaints caused her insomnia, extreme anxiety, panic attacks and hair loss.  Per her doctor's instructions, she took a six-week medical leave from March 5 to April 8, 2021.

73.     During Ms. Moses-Taylor's medical leave, Dr. Jennings transferred two of her direct reports, Mr. Dalipi and Mr. Townes, out of the WD Program and moved them into the Center for Open Hiring, the program that Dr. Jennings was responsible for overseeing.

74.     Neither Mr. Dalipi nor Mr. Townes were permitted a proper transition period, which hindered Ms. Moses-Taylor's ability to keep the WD Program afloat upon her return from leave, and also hurt both the team and the underprivileged individuals the Program served.  For example, 17 WD graduates who committed to the program with the promise of employment (the whole point of the WD Program), had no one to help them with job placement.

75.     Specifically, just weeks after Ms. Moses-Taylor's leave commenced, in mid-March 2021, Dr. Jennings removed Mr. Townes from the WD Program and promoted him to Regional Director for the Center for Open Hiring, with a $40,000 pay increase, bringing his total compensation to $88,000.

76.     Also during Ms. Moses-Taylor's leave, in or around late March 2021, Dr. Jennings transferred Mr. Dalipi out of the WD Program and promoted him to a Career Specialist position with the Center for Open Hiring, with an $11,000 pay increase.

77.     Yet, the day before Ms. Moses-Taylor's scheduled return, on April 8, 2021, Mr. Dalipi sent an email to Dr. Jennings requesting the transfer and promotion she had already granted him.  He cited as the reason for his request "the work environment over at WD" which "ha[d] become toxic and unhealthy," causing him to feel "increasingly uncomfortable in recent months."  On information and belief, Dr. Jennings instructed Mr. Dalipi to send this email and assisted him with drafting it.

78.     On April 9, 2021, Ms. Moses-Taylor returned to work.  Upon her return, she was blindsided by complaints from Mr. Townes and Mr. Dalipi.  In her more than 16 years at Greyston, none of Ms. Moses-Taylor's staff ever made a complaint against her.  To the contrary, she had consistently enjoyed positive and meaningful relationships with her reports and otherwise went out of her way to foster their success and growth at Greyston.

79.     Then HR Director Ms. Gargiulo was equally surprised by Mr. Dalipi's complaint, stating in her response to Mr. Dalipi:

> This is very surprising since this is the first time I am hearing any thing [sic] like this.
>
> As a matter of fact, WD has always been recognized as the model work team at Greyston.
>
> Usually this is something that you would discuss with your supervisor who I know you have a close relationship with.

80.     Like Mr. Dalipi, Mr. Townes never raised any concerns about his working relationship with Ms. Moses-Taylor, or HR, during the seventeen months he reported to her.  To the contrary, he praised her as a manager.  For example, in October 2020, Mr. Townes wrote to

Ms. Moses-Taylor, "you've been good to me as a supervisor," and in late December 2020, expressed his appreciation for her "honesty and efforts to keep [staff] professionally and physically safe," noting in that same text the "palpable" "tension" he felt from President and CEO Mr. Kenner and VP of Finance and Operations Mrs. Telford.

81.     Upon Ms. Moses-Taylor's return from medical leave, many employees expressed surprise to see her back, informing Ms. Moses-Taylor that Dr. Jennings announced that she was not returning to Greyston and had instructed them to cease any communication with her.

82.     Dr. Jennings also threatened Ms. Moses-Taylor's supporters, making clear that they needed to "pick a side" if they wanted to keep their jobs – Dr. Jennings or Ms. Moses-Taylor.  Those who picked the "right" side like Messrs. Dalipi and Townes were awarded with promotions and pay increases.  As described below, those who stood by Ms. Moses-Taylor – the "wrong" side – were fired or left voluntarily due to leadership's hostility.

83.     In mid-March 2021, through counsel, Ms. Moses-Taylor complained about the ongoing retaliation, which only fueled Greyston's retaliatory campaign against her.

**Greyston Sets the Stage for Ms. Moses-Taylor's Retaliatory Firing**

84.     As a result of Greyston's retaliatory takedown of Ms. Moses-Taylor and her WD Program, in just a month, she went from having a four-person team to having no direct reports. Her other two long-time staff, Ms. Saint-Hilaire and Ms. Saunders resigned on April 9 and May 24, 2021, respectively, citing as one of the reasons the mistreatment against Ms. Moses-Taylor and the hostility they suffered for supporting her and the WD Program.

85.     Despite the clear need for staffing to keep her WD Program alive, in mid-April 2021, Greyston informed Ms. Moses-Taylor that she was not allowed to fill any of the vacant positions on her team.

86.     As a result, Ms. Moses-Taylor, a Director, was forced to perform the duties of her former reports, including, for example, ordering garbage bags, spending hours driving around to supervise the WD Rangers, overseeing and teaching trainings, and assisting graduates with job placement.

**Greyston Terminated Ms. Moses-Taylor's Employment in Retaliation for Her Protected Complaints, for Pretextual and Demonstrably False Reasons**

87.     At some point prior to her return from medical leave, Greyston hired a third party to "investigate" the orchestrated and false complaints Mr. Dalipi and Mr. Townes made against Ms. Moses-Taylor.

88.     Ms. Moses-Taylor fully cooperated in that investigation, including attending multiple interviews spanning over six hours in late April 2021.

89.     It was clear both to Ms. Moses-Taylor and others who were interviewed that Greyston was on a fishing expedition and tasked the investigator to find *anything* – no matter how trivial, false, or old – that the Foundation could use to justify firing Ms. Moses-Taylor.  For example, the investigator did not ask one of Ms. Moses-Taylor's long-time reports anything about the allegations by Messrs. Dalipi and Townes – the alleged basis for the investigation.

90.     The investigator also baited Ms. Moses-Taylor's direct report for negative feedback on Ms. Moses-Taylor, and ended the interview when the employee made clear that she did not have anything bad to say about her supervisor.

91.     The investigator provided her report to Dr. Jennings and President and CEO Mr. Kenner on May 14, 2021, if not earlier.

92.     Approximately one week later, on May 19, 2021, Greyston effectively terminated Ms. Moses-Taylor's employment.

93.     At or around 5:00pm that day, Greyston sent security personnel to Ms. Moses-

Taylor's office to hover over her while she collected her personal effects, and then escorted her out of the building.  News of this extremely humiliating and public display spread fast both inside and outside of Greyston.

94.     On May 19, 2021, Greyston terminated Ms. Moses-Taylor's medical benefits.

95.     On May 19 or 20, Greyston issued three separate, written announcements of Ms. Moses-Taylor departure: (1) an auto-reply from her Greyston email address, stating "We wish to inform you that Dail Moses-Taylor is no longer an employee of Greyston"; (b) an auto-reply from her Team's account with the same message; and (c) an instruction to its security company (Elite) to send a text blast to all security personnel, stating that Ms. Moses-Taylor is an "ex employee" who is banned from Greyston's property.

96.     On May 21, 2021, counsel for Greyston claimed that its investigation revealed "serious violations" of the Foundation's (unenforced) Use of Company Vehicle Policy.

97.     The first "serious violation" occurred in 2018 or 2019, when Ms. Moses-Taylor asked Mr. Dalipi to drive the Greyston van to a rental property she owned less than two miles from Greyston, to pick up bulk trash for disposal in its dumpster.  Her request was not uncommon, as others used Greyston's vans (and Jeep) for personal reasons, including Mr. Dalipi himself and President and CEO Mr. Kenner, of which Greyston management was aware.

98.     The second "serious violation" supposedly occurred in February 2020, where Ms. Moses-Taylor was falsely accused of signing out and using the Greyston van for personal reasons.  Greyston ignored Ms. Moses-Taylor's evidence of date/time-stamped photos demonstrating that she was at her house 55 miles away from Greyston during the alleged incident and her explanation that the signature on the log signing out the van was not hers.

99.     On May 21, 2021, Greyston claimed that its various announcements of Ms.

Moses-Taylor's departure were "an error" and that instead she was placed on unpaid administrative leave pending a determination of "what remedial action [was] required."

100.    However, two weeks after Ms. Moses-Taylor requested reinstatement, on July 7, 2021, through its counsel Greyston confirmed that it was terminating her employment based on the findings of its investigation, specifically the alleged violation of Greyston's Use of Company Vehicle Policy.  Greyston HR later wrote to Ms. Moses-Taylor, informing her that her employment was being terminated effective July 14, 2021, although Defendant had not paid Ms. Moses-Taylor since May 19, 2021.

101.    Even since her unlawful firing, Greyston has continued its retaliatory pursuit by targeting anyone who supports Ms. Moses-Taylor.  On or about May 28, 2021, Greyston terminated the services of two Elite security guards, who they suspected provided Ms. Moses-Taylor the text blast to security personnel (sent per Greyston's instruction), that she was an "ex employee" banned from Greyston.

102.    Dr. Jennings told the security guards that they were no longer welcome at Greyston because they "chose the wrong side."

## FIRST CAUSE OF ACTION
### Retaliation in Violation of New York's Not-For-Profit Corporation Law § 715(b)

103.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

104.    Pursuant to the N-PCL § 715(b), as a non-profit organization with more than 20 employees and an annual revenue that exceeds $1,000,000, Greyston is required to have a whistleblower policy that complies with the N-PCL.

105.    That whistleblower policy must provide that "no director, officer, employee or volunteer who in good faith reports any action or suspected action taken by or within the

organization that is illegal, fraudulent or in violation of any policy of the organization shall suffer intimidation, harassment, discrimination or other retaliation or, in the case of employees, adverse employment consequences."

106.    During the relevant time period, Greyston did not have a whistleblower policy, let alone one that complies with the N-PCL, despite representing to the federal government in its Form 990s that it has such a policy.

107.    The N-PCL prohibits retaliation against individuals who report in good faith any action or suspected action that is in violation of, *inter alia*, "any policy of the organization."

108.    Per its policies, the Foundation must prevent workplace violence, maintain a "safe work environment" and "safe" and "healthy" working conditions, and protect the "safety and security" of its employees. *See, e.g.*, Handbook §§ 1-5, 1-7, 1-8, 2, 2-2.

109.    Greyston's Workplace Violence Prevention policy expressly requires employees to report to a manager, supervisor or HR, "[a]ny threats" by employees, "customers, vendors, solicitors, or other members of the public." Handbook § 1-8. Employees are also required to report "[a]ll suspicious individuals or activities, commotions or disturbances." *Id.* These policies forbid unauthorized visitors in order to "[t]o provide for the safety and security of employees and the facilities at Greyston." *Id.* § 3-16. Greyston promises employees that "[a]ll reports can be made without fear of reprisal or retaliation." *Id.* § 1-7.

110.    Additionally, pursuant to its Handbook, Greyston encourages employees to raise with management  "ideas, concerns, or suggestions for improved safety in the workplace." *Id.* § 1-7. Greyston also invites employees to raise "any issues or questions relating to the application or interpretation" of its Handbook, policies, or "other directives." *Id.* § 2-1.

111.    Ms. Moses-Taylor had a good faith belief that Greyston took actions or suspected

actions that were in violation of these policies, which she then reported to leadership and HR.  In so doing, Ms. Moses-Taylor acted in accordance with her reporting obligations under Greyston's policies.

112.    Greyston retaliated against Ms. Moses-Taylor because of her good faith reports and objections to misconduct within the organization that violated Greyston policies, including by denying her the November Promotion, in violation of the N-PCL.

113.    Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of Title VII

114.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

115.    Plaintiff engaged in protected activity when she complained about being denied the June Promotion based on her race and gender.

116.    By the acts and practices described herein, Defendant retaliated against Plaintiff for her opposition to unlawful discrimination in violation of Title VII.

117.    Defendant engaged in its retaliatory actions with malice or reckless indifference to Plaintiff's statutory rights.

118.    Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

### THIRD CAUSE OF ACTION
### Retaliation in Violation of the NYSHRL

119.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

120.   Plaintiff engaged in protected activity when she complained about being denied the June Promotion based on her race and gender.

121.   By the acts and practices described herein, Defendant retaliated against Plaintiff for her opposition to unlawful discrimination, in violation of the NYSHRL.

122.   Defendant engaged in its retaliatory actions with willful or wanton negligence and reckless indifference to Plaintiff's statutory rights.

123.   Plaintiff is entitled to damages as a result of Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Ms. Moses-Taylor respectfully requests that this Court grant the following relief:

A.   Declare the acts and practices complained of herein to be violations of the N-PCL, Title VII, and the NYSHRL;

B.   Enjoin and permanently restrain these violations of the N-PCL, Title VII, and the NYSHRL;

C.   Direct Defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

D.  Direct Defendant to reinstate Plaintiff into the position(s) she was denied or a comparable position, or in the alternative, set Plaintiff's compensation and benefits at a comparable level to that position(s);

E.  Award Plaintiff damages to make her whole for all earnings she would have received but for Defendant's unlawful treatment, including, but not limited to, wages, bonuses, pension and retirement benefits, health care coverage, and other lost benefits, including future lost wages and benefits;

F.  Award Plaintiff compensatory damages for injuries, including humiliation, emotional distress damages, and out of pocket medical costs, suffered as a result of Defendant's unlawful treatment;

G.  Direct Defendant to pay punitive damages under Title VII and the NYSHRL, in an amount to be determined by the jury;

H.  Award Plaintiff damages to compensate for any adverse tax consequences;

I.  Award pre-judgment interest at the statutory rate of 9%;

J.  Award Plaintiff attorneys' fees, costs, and disbursements pursuant to applicable law; and

K.  Award such other legal and equitable relief as this Court deems necessary, just, and proper.

Dated:     July 30, 2021

By: _____
    Tammy T. Marzigliano

**OUTTEN & GOLDEN LLP**
Tammy T. Marzigliano
Allison L. Van Kampen
Shira Z. Gelfand
685 Third Ave, 25th Floor

New York, New York 10017
Telephone: 212-245-1000

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury on all issues subject to trial by jury.

Dated: July 30, 2021

By:_____
    Tammy T. Marzigliano

**OUTTEN & GOLDEN LLP**
Tammy T. Marzigliano
Allison L. Van Kampen
Shira Z. Gelfand
685 Third Ave, 25th Floor
New York, New York 10017
Telephone: 212-245-1000

*Attorneys for Plaintiff*